IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIMOTHY TROTT ) | |
| *Plaintiff,* ) | |
| ) | Civil Action No.   1:23-CV-219 |
| v. ) | |
| ) | |
| UBS FINANCIAL SERVICES, INC. ) | |
| *Defendant.* ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Timothy Trott, by his attorneys at the Mizner law Firm, brings this action pursuant to the Americans with Disabilities Act of 1990 ("ADA") against UBS Financial Services, Inc. for failing to reasonably accommodate his disability and states:

### A.  Parties.

1. Plaintiff Timothy Trott is an adult individual who resides in Erie County, Pennsylvania.

2. Defendant UBS Financial Services, Inc. ("UBS") is a Delaware corporation which operates locations throughout the United States, including at 100 State Street Fourth Floor, #460, Erie, Pennsylvania 16507 (the "Erie Branch").

3. Upon information and belief, UBS is a subsidiary of UBS Group AG, a global financial services bank based in Switzerland, considered one of the world's largest and most respected investment banks, providing financial services to private, corporate and institutional clients.

4. At all relevant times, Mr. Trott was employed by UBS at the Erie Branch, as a financial advisor.

1

**B. Jurisdiction and Venue.**

5. Plaintiff Timothy Trott brings this action pursuant to 28 U.S.C. 2201 and 2202, for claims arising under the Americans with Disabilities Act, 42 U.S.C. 12101, *et seq*.

6. This Court has jurisdiction over these claims pursuant to 28 U.S.C. 1331.

7. Venue is appropriate in this District pursuant to 28 U.S.C. 1391(b) because Defendant's office where the acts and omissions relevant to this action took place is located in Erie, Pennsylvania, within the Western District of Pennsylvania.

**C. Facts.**

8. Mr. Trott was employed by UBS as a financial advisor from approximately December 2008 through June 2017.

9. Upon Mr. Trott's hiring, he was offered a compensation package which included no salary, but instead had a single lump-sum cash payment of $454,670.00, which would be secured by a promissory note requiring Mr. Trott to repay the amount in full, with interest, unless he remained employed with UBS.

10. The $454,670.00 loan was to be forgiven, in full, without any payment made by Mr. Trott, if he remained continuously employed by UBS through January 2, 2018.

11. In addition to the initial loan, Mr. Trott earned income from UBS via commissions.

12. In April 2015, Mr. Trott began to experience Major Depression Disorder and anxiety which impacted his ability to work effectively, and as a result took a two-week leave of absence from UBS.

13. Mr. Trott's clients were serviced by another financial advisor at UBS, and as a result UBS did not experience any disruption or loss in financial services due to Mr. Trott's absence.

14. Although Mr. Trott returned to work after his April leave of absence, on about June 17, 2015, Mr. Trott took another leave of absence and was committed to a mental health facility.

15. He was placed on Unpaid Medical Leave by UBS, and advised that he would need a physician's recommendation, in the form of a UBS "Healthcare Provider Certification," in order to return to work.

16. Over the next several months, Mr. Trott underwent treatment including both medication and therapy, which was highly successful in treating his mental health condition.

17. By April 2016, Mr. Trott's condition had improved to the point that his treating psychiatrist, Antonio S. Simora, DO, agreed that he could return to work, on the condition that UBS provided certain accommodations to ease Mr. Trott back into the workforce.

18. Mr. Trott obtained a Healthcare Provider Certification form from UBS, and provided it to Dr. Simora, who completed it on April 20, 2016.

19. Dr. Simora recommended that Mr. Trott return to work on reduced hours of fifteen to twenty (15-20) hours per week, until his progress upon return to the office could be clinically evaluated.

20. Dr. Simora recommended that this clinical evaluation take place on May 20, 2016, one month after he completed the Healthcare Provider Certification.

21. Mr. Trott promptly provided the completed form to UBS.

22. On May 8, 2016, Mr. Trott had not yet received a response from UBS, and therefore followed up with UBS to confirm it received the Certification.

23. On May 12, 2016, a UBS employee, Ms. Iris LeBron, advised Mr. Trott that his Certification had been received, and that UBS was reviewing his request for accommodation and would contact Mr. Trott once a determination was made. Specifically, Ms. LeBron wrote, "We are reviewing the request for accommodation and contact [sic] you once a determination has been made and/or if additional information is needed. Thank you for your patience."

24. On June 6, 2023, Mr. Trott wrote to Ms. LeBron, "Would certainly appreciate an update on my situation. You have now been in receipt of my paperwork for over a month and I have not heard anything. Am anxious to understand the status."

25. On June 7, 2023, Ms. LeBron responded, "On the most recent certification you submitted, your doctor indicated you would be further evaluated on 05/20/2016; can you confirm if there were any updates from that visit?"

26. Twenty-five (25) minutes later, Mr. Trott responded, "Nothing of significance. Was interested in knowing how work was going - that was the primary reason for the appointment. Wanted to evaluate me shortly after I started back to see how things were progressing and how well I was adapting."

27. UBS did not respond to this correspondence.

28. On August 25, 2016, Mr. Trott wrote to Ms. LeBron, "has been almost three months since you acknowledged receipt of my doctor certification and I have heard nothing. Would appreciate some update on my status and when/how I would be able to return to work."

29. Neither Ms. LeBron nor anyone else ever responded to this request.

30. In late January, 2017, Mr. Archie Cravens of UBS wrote to Mr. Trott, inquiring when his next doctor appointment would take place.

31. On February 2, 2017, Mr. Trott advised his next doctor's appointment was scheduled for February 20, 2017, and that he would obtain an updated Healthcare Provider Certification.

32. On February 24, 2017, Mr. Trott emailed Mr. Craven to advise that he would be receiving the updated Certification by mail, and requested acknowledgement upon receipt.

33. The updated certification once again recommended that Mr. Trott return to work on reduced hours of fifteen to twenty (15-20) hours per week, with further evaluation of his progress once he returned to work, and that he receive orientation and training upon his return to the office, to facilitate his transition back to work.

34. Astonishingly, UBS once again failed to respond in any way to either this correspondence, or the updated Certification.

35. Mr. Trott did not hear from UBS again until April 10, 2017, when Mr. Craven wrote: "I was just following up with you regarding your latest doctor visit. Please provide a status re: potential return to work."

36. Mr. Trott responded, "not sure which appointment you are referring to. Had one at the end of February and forwarded the certification to you. From this appointment my medications were changed. Since it takes 8-10 weeks to determine the impact, my next appointment will be in May."

37. Mr. Craven did not respond to this until April 26, 2017, when he asked "Can you advise the date of your next appointment?"

38. Mr. Trott responded, "next appointment is 5/22 at 9:30."

39. On June 9, 2017, Mr. Cravens inquired about his physician appointment and if there was any progress, to which Mr. Trott advised there was no further progress.

40. On July 14, 2017, Mr. Trott received a letter from Ms. Stephanie Basham, from the UBS human resources office, dated June 28, 2017, advising that he was terminated effective as of that date.

41. According to Ms. Basham, Mr. Trott was being terminated due to the response to UBS's letter of May 12, 2017, advising that Mr. Trott was not currently able to work.

42. None of this made any sense, as Mr. Trott was never sent any letter or email dated May 12, 2017, nor had he or his physicians ever advised that he was not currently able to work.

43. In addition to losing his employment, and the opportunity to earn commissions, Mr. Trott also became required to repay the loan which UBS had issued him as part of his initial employee compensation at the time of his hiring, due to his failure to remain employed by UBS through January 2, 2018.

44. Mr. Trott timely filed a Charge of Discrimination against UBS with the Pennsylvania Human Relations Commission on October 3, 2017.

45. On February 15, 2018, UBS through counsel filed a Position Statement with the United States Equal Employment Opportunity Commission ("EEOC") denying that Mr. Trott's claims had any merit, on the basis that UBS had made "multiple extensions of Mr. Trott's unpaid leave as an accommodation in each instance his leave expired. After he sought additional leave in June 2017, UBSFS determined that further job-protected leave was no longer reasonable because Mr. Trott confirmed he had no anticipated return to work date."

46.     This was completely incorrect, as Mr. Trott had been attempting to return to work since April 2016, and had never been provided with the promised "determination" of his request for accommodation by UBS.

47.     On April 24, 2018, EEOC Area Director Roosevelt Bryant issued a determination that "I find there is reasonable cause to believe that Respondent discriminated against Charging party based on his disability by refusing to provide him with a reasonable accommodation and subsequently discharging him, in violation of the ADA."

48.     Director Bryant directed the parties to engage in conciliation, which was ultimately unsuccessful.

49.     After a significant delay, on June 14, 2023, the EEOC issued a Notice of Right to Sue to Mr. Trott, directing that he had ninety (90) days to file suit against UBS related to his discharge.

50.     As such, this Complaint is timely.

### D. Legal Standard.

51.      The ADA prevents an employer from failing to provide "a reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).

52.     Major Depressive Disorder constitutes a disability for purposes of the ADA. *See Pritchard v. Southern Co. Services*, 92 F.3d 1130, 1132 (11th Cir. 1996), *amended on reh'g,* 102 F.3d 1118 (11th Cir. 1996); *Shea v. Tisch*, 870 F.2d 786 (1st Cir. 1989); *Doe v. Region 13 Mental Health-Mental Retardation Commission*, 704 F.2d 1402, 1408 (5th Cir. 1983), *reh'g denied,* 709 F.2d 712 (5th Cir. 1983).

53. A prima facie failure to accommodate case is made when an employee proves: (1) she is an individual with a disability under the ADA; (2) she can perform the essential functions of her position with accommodation; (3) her employer had notice of her alleged disability; and (4) the employer failed to accommodate her. *See Rhoads v. F.D.I.C.* 257 F.3d 373, 387 n.11 (4th Cir. 2001); *Mitchell v. Washingtonville Cent. School Dist.*, 190 F.3d 1, 6 (2d Cir. 1999). If any one of these elements is not present, the claim must fail.

54. Additionally, both employers and employees have a duty to engage in a process which requires both parties to attempt to identify potential accommodations that will permit the disabled worker to continue working. This is known as the "interactive process." *See* 29 C.F.R. § 1630.2(o)(3).

55. An employee can demonstrate that her employer failed to participate in this interactive process by showing that: (1) the employer knew about the employees disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. *See Taylor v. Phoenixville School District*, 184 F.3d 296, 319-20 (3d Cir. 1999).

### COUNT I - VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

56. The allegations in the foregoing paragraphs are incorporated herein by reference, as if set forth in full below.

57. Mr. Trott began suffering from Major Depressive Disorder in April 2015, which substantially limited one or more of his major life activities, including his ability to work as a financial advisor at UBS.

58. As such, Mr. Trott's Major Depressive Disorder constituted a disability for the purposes of the ADA.

59. UBS was fully aware of Mr. Trott's disability, and the reason for his leave of absence.

60. After taking a leave of absence from work, Mr. Trott was cleared and recommended by his treating physician to return to work at UBS on or about April 20, 2016.

61. Mr. Trott and his treating physician submitted UBS's completed form, in an attempt to return to work with the reasonable accommodation that he began by working fifteen to twenty (15-20) hours per week.

62. Despite repeated requests, UBS never provided Mr. Trott with a substantive response to his request to return to work with reasonable accommodations.

63. As a result, Mr. Trott and his treating physician submitted a second completed UBS form on or about February 24, 2017.

64. Despite repeated requests, UBS never provided Mr. Trott with a substantive response to his request to return to work with reasonable accommodations.

65. On June 28, 2017, UBS terminated Mr. Trott under false pretenses; namely, that he or his physician advised that he was not able to return to work.

66. This basis for the termination of Mr. Trott was utterly false. To the contrary, Mr. Trott had been requesting and hoping to return to work for more than a year, at the time he was terminated.

67. Mr. Trott was fully capable of returning to work with reasonable accommodations, but was denied that opportunity by UBS.

68. UBS's refusal to provide Mr. Trott with a reasonable accommodation; namely, returning to work for less than full time, violated its obligations under the ADA.

69. Mr. Trott attempted to engage in an interactive process with UBS to facilitate his return to work, by repeatedly submitting his physician's recommendation and following up with UBS.

70. However, UBS did not engage in any interactive process, nor did UBS make a good faith effort to assist Mr. Trott; to the contrary, Mr. Trott's requests were almost totally ignored by UBS, which never engaged him on the question of when he could return to work, or what type of accommodation UBS was willing to offer him.

71. Mr. Trott's condition could reasonably have been accommodated by allowing him to initially return to work on a part-time basis, but that effort was frustrated by UBS's utter failure to engage or respond to his requests for accommodation.

72. UBS's failure to provide Mr. Trott with a reasonable accommodation and allow him to return to work, as recommended by his treating physician, was without legal justification or excuse, and violated the plain language of the ADA.

73. As a result of UBS's refusal to provide Mr. Trott a reasonable accommodation, and UBS's failure to engage in any interactive process, he has suffered significant harm, including the loss of his employment, the loss of his income from UBS, the exclusion from the loan forgiveness program which he enjoyed as an employee of UBS, as well as significant stress, anxiety, embarrassment, and humiliation associated with his termination.

WHEREFORE, Plaintiff Timothy Trott respectfully requests that this Honorable Court enter judgment in his favor and against UBS Financial Services, Inc., in an amount in excess of $75,000.00, along with attorney fees and costs, and all other relief permitted by law.

Respectfully submitted,

MIZNER LAW FIRM

By: /s/ John F. Mizner

John F. Mizner
PA Bar No. 53323
jfm@miznerfirm.com

Joseph P. Caulfield
PA Bar. No. 322823
jpc@miznerfirm.com

311 West Sixth Street
Erie, Pennsylvania 16507
814.454.3889

*Attorneys for the Plaintiff*